WILLIAM J. BYRNES, Respondent, *v.* CHASE NATIONAL BANK and Others, Appellants, Impleaded with ERNEST L. CONANT and Another, Respondents, and ROBERT W. NELSON and Others, Defendants.*

First Department, December 28, 1928.

* Affd., 251 N. Y. ——.

*George N. Hamlin* of counsel [*Rushmore, Bisbee & Stern,* attorneys], for the appellants.

*L. Barton Case,* for the respondent.

O'MALLEY, J.   The judgment appealed from fixes upon the subscribers to the Federal Syndicate Agreement (hereinafter called the syndicate) liability for breach of a contract for the sale of a parcel of real estate, made in its name, and relieves the managers of such syndicate who executed it, from liability.   The defendants, appellants, the subscribers, base their appeal upon the grounds (1) that no liability attaches to any defendant; (2) that if there be such liability, it must fall upon the managers rather than the subscribers; and (3) the appellant, Chase National Bank, upon the special ground that the syndicate agreement out of which the contract sued upon arises (and hence the contract itself) is *ultra vires* so far as it purports to obligate such defendant beyond the amount of its subscription.   We will consider in order the syndicate agreement with its corelated agreements and the special contract sued upon.

The syndicate agreement, executed August 6, 1924, is to be considered in connection with one of even date therewith and also with one of June 27, 1924.   This earlier agreement was between the Standard Agricultural Chemical Corporation (hereinafter called the Chemical Corporation) and Andrew P. Mackie.   The Chemical Corporation owned Florida lands and an estimated tract of 2,500 acres in New Jersey, upon all of which the defendant Chase National Bank held a trust mortgage.   The agreement gave Mackie the exclusive right to sell certain portions of such lands in both States, but we are concerned only with the New Jersey lands.   Of these, 800 acres were assigned to Mackie, sales to be made upon certain prescribed terms.   Mackie was to organize a sales force and supervise and direct it.   He was required not later than August 1, 1924, to assign his contract and all his rights thereunder to the syndicate, or some other syndicate satisfactory to the Chemical Corporation, to be constituted substantially in accord with a proposed agreement attached to and made a part of the principal agreement.

The proposed agreement thus referred to was dated in June, without specific day, and was in all respects like the syndicate agreement finally executed.   It contained the names of the five individuals designated as managers, namely, Robert W. Nelson, Ernest L. Conant, William L. Bradley, Lawrence B. Elliman and

William J. McKee. These were the individuals who finally became parties of the first part to the syndicate agreement. The names of the subscribers who were to become parties of the second part upon its signing were not disclosed.

The syndicate agreement of August sixth was signed by the appellants, Chase National Bank, Edward S. Hughes and Jervis R. Harbeck, as subscribers. It recited the ownership of New Jersey and Florida lands by the Chemical Corporation, the latter's contract with Mackie, the syndicate's desire to acquire the Mackie contract and certain securities of the Chemical Corporation, and the desire of the subscribers to become members of the syndicate to the extent of their subscriptions. The parties agreed to form the syndicate for the purpose of purchasing Mackie's contract with the Chemical Corporation " and to carry on the operations and work therein intended to .be carried on by Mackie," and to purchase securities from the Chemical Corporation at prices to be decided upon by the managers. Subscriptions were to consist of 1,250 units of $2,000 each, and in the event of incorporation, each subscriber was to have representation *pro rata* in the obligations of the corporation. Subscriptions were payable upon call by the managers. The latter had the right to become subscribers, in which event they were to " have all rights and be subject to all the liabilities of other subscribers, but unless they shall become such subscribers their liability shall be only that of Syndicate Managers, as herein defined."

The agreement vested the managers with full power and discretion in the management of the affairs of the syndicate. This included control over the selling plan for lands and securities acquired from the Chemical Corporation at such prices as the managers might determine. Shares of stock owned by the syndicate were to be carried in the name of the managers and voting rights therein exercised by them. They also had power to borrow money for the syndicate account upon such terms and conditions as they might deem proper; to execute and indorse notes, checks and drafts, and pledge securities, and to make reasonable expenditures in connection with the business of the syndicate.

In the event of incorporation " the members of the Syndicate " upon becoming stockholders were to execute a voting trust agreement appointing the managers voting trustees for the stock. Vacancies in the office of managers were to be filled by them and not by the subscribers. There was provision for a redemption fund by means of which the managers were to pay to subscribers the amount of their subscriptions prior to the distribution of profits.

The syndicate itself and the agreement forming it were terminable at any time by action of a majority of the managers, and in any event on December 31, 1930, unless otherwise extended by agreement of the managers. Upon termination in any manner, the managers were to distribute *pro rata* to each subscriber his net share of accrued profits, which in the event of incorporation was to be paid in the form of a liquidation dividend. Power to incorporate at any time was left to the judgment of the managers. There was a further provision, as follows: " Nothing herein contained shall constitute the parties hereto partners, nor render any one of the subscribers liable to contribute more than the amount set opposite his signature hereto."

Certificates showing the number of units held by each subscriber were to be issued by the managers and the defendant Chase National Bank was to be registrar thereof. The defendant, appellant, Harbeck subscribed for units of a total value of $635,294; the defendant, appellant, Hughes, for $882,352; and the defendant, appellant, Chase National Bank, for $564,706.

Contemporaneously with the syndicate agreement and on August 6, 1924, there was executed a tripartite agreement between Mackie, as party of the first part, the syndicate through its five managers, as party of the second part, and the Chemical Corporation as party of the third part. This recited the Mackie agreement with the Chemical Corporation of June twenty-seventh and the formation of the syndicate on August sixth for the " purpose of purchasing said Selling Contract with the rights and privileges appurtenant thereto."

By this, Mackie assigned all his rights in the " Selling Contract " to the syndicate and the latter assumed all his obligations thereunder and agreed to indemnify and save harmless the Chemical Corporation from any loss resulting from acts of Mackie. The syndicate agreed to employ Mackie as " General Manager of its land sales to perform the duties and render the services in said Selling Contract " and Mackie agreed to accept said employment and perform such services until the termination of the syndicate. His duties and services were to be the same as specified in the selling contract, and he was to form a sales organization to sell the lands. The expense of such organization was to be paid with funds provided for by the syndicate, " by the appropriation by the managers from the participation remaining in the Syndicate treasury of 30 participations in the Syndicate which participations shall be sold by the Syndicate and the proceeds disbursed by the managers for the expenses of such organization." Mackie was required to " submit to the Syndicate Managers a detailed expense account

which shall be subject to their approval as to the reasonableness of the items thereof within the intent and purposes of this clause."

The payment of commissions and expenses of such sales organization is further provided for by the syndicate making allowance to Mackie of the maximum sum of eighty dollars for each acre of land sold, out of which " all reasonable and proper expenses of any nature of Mackie's said organization are to be paid by the Managers, providing further, however, that such funds shall be disbursed by the Syndicate Managers only upon submission to the Managers by Mackie of a detailed expense account, which said expense account shall be subject to their approval as to the reasonableness of the items thereof within the intent and purposes of this clause." By another clause of the agreement Mackie was to receive one-half of all the profits of the syndicate whether accruing from the sale of lands or securities or any other of its operations. The final clause of the agreement read: " (10) The Syndicate Managers are not in any way made personally liable by any paragraph of this agreement."

The contract for breach of which judgment has been entered, was made October 27, 1924, between Thomas James Whelan, plaintiff's assignor, and the syndicate through the defendant Conant, its president and one of its managers. It provided for the sale to Whelan of thirty acres of the New Jersey lands for the sum of $18,500. It recited the down payment in cash of $5,570, the balance of the purchase price to be paid in installments secured by mortgages, the deed to be delivered in ninety days. Breach of covenant of delivery is conceded.

The plaintiff's action was brought against not only the three defendant subscribers to the syndicate, but also against its managers, two of whom, Conant and Elliman only, were served. The verdict for damages, limited to the amount of the down payment with interest, was returned against all defendants served, but on motion it was set aside as against Conant and Elliman. So far as appears plaintiff has not appealed from the order thus made.

We are of opinion that the evidence was sufficient to warrant a finding that plaintiff's assignor, Whelan, had a binding contract, the basis of this suit, for the purchase of lands. It was negotiated by Mackie who had become one of the sales managers for the syndicate and who was acting as such when the contract was made. It was signed by Conant, the president of the syndicate and one of its managers, on behalf of the syndicate. Assuming without conceding that such contract would not be binding without the cash down payment of $5,570, recited therein, we think that the jury were warranted in finding that such payment had in fact been made. Plaintiff's assignor Whelan was employed by Mackie on

behalf of the syndicate and had received payments from it through its treasurer on account of such services. As already appears, the syndicate had set aside a fund to meet some if not all of Mackie's sales expenses. These facts justified the conclusion that Whelan's hiring was the obligation of the syndicate and not of Mackie personally.

In October, 1924, Whelan had demanded payment of the balance due him on account of such services. It was suggested by Mackie that he take payment in lands. To this he agreed with the result that he received in cash a part of what was due him and the balance of $5,570 was credited to him as a cash payment on the contract of purchase. If the syndicate was obligated to pay such sum to Whelan, it was immaterial whether it paid cash or gave credit, as was here done. While part of the services for which Whelan received payment may have been performed prior to the final organization of the syndicate, it appears that they were rendered in contemplation that the syndicate would be formed, and Mackie's contract with the Chemical Corporation provided for the taking over thereof by the syndicate. As already appears, this was done and the syndicate received the full benefit, not only of Mackie's services prior to the organization of the syndicate but also of those of Whelan who was in his employ. The services rendered by Whelan consisted largely of surveying the whole tract of 2,500 acres. It is urged by the appellants that as the syndicate was interested in only 800 acres, a charge against it for surveying the whole tract could not properly be made. Whelan's testimony indicated, however, that the survey of the whole tract was of benefit to the syndicate. His survey disclosed a shortage of 200 acres in the whole tract, and there was evidence tending to show that the syndicate later purchased the full tract of 2,300 acres thus surveyed by Whelan. We think that the services rendered by Whelan for Mackie prior to the organization of the syndicate and those performed after its formation were so closely related that all in fact became an obligation of the syndicate.

There remains the question of whether the syndicate subscribers or the managers are liable on the contract made. The answer depends upon whether the managers are to be regarded as trustees or quasi trustees, and the subscribers beneficiaries of a trust, or whether the subscribers or members constitute a partnership or joint adventurers with the managers acting merely as their agents. If the managers are trustees, then they are personally liable; if agents of subscribers in a joint venture, the latter are liable as principals. The trial court, in setting aside the verdict as against the managers, adopted the latter view.

The application of the proper rule in cases of this character becomes at times difficult. It could serve no useful purpose to set forth and discuss at length the various decisions in different jurisdictions, or even in the same jurisdiction. The manner of doing business adopted by the defendants herein is of comparatively recent origin, and the legal principles defining the rights and liabilities of participants are not strictly fixed. The instruments which create such business ventures vary in their terms, as do the acts of the parties thereunder; and this is so whether the instrument creates a trust relationship or that of a partnership or joint venture. As was said in *Frost* v. *Thompson* (219 Mass. 360, 365): " Whether it is the one or the other depends upon the way in which the trustees are to conduct the affairs committed to their charge. If they act as principals and are free from the control of the certificate holders, a trust is created; but if they are subject to the control of the certificate holders, it is a partnership."

This test is a logical and workable one and has been applied in numerous decisions of which but a few need be cited. (*Crocker* v. *Malley*, 249 U. S. 223; *Hecht* v. *Malley*, 265 id. 144; *Hornblower* v. *White*, 21 F. [2d] 82; *Williams* v. *Milton*, 215 Mass. 1; *Sleeper* v. *Park*, 232 id. 292; *Horgan* v. *Morgan*, 233 id. 381.) It seems to have been followed and adopted as the basis of the decision by our own Court of Appeals, in *Jones* v. *Gould* (209 N. Y. 419). That was a case where a creditor sought to hold as a partner one manager of a syndicate on a contract made by another manager. The syndicate was formed to buy one railroad, build another and to buy certain adjacent land. The court held that the relationship between the managers and the subscribers, though fiduciary, was not that of principal and agent. It held the managers liable on the theory that they were principals. This result seems to have been predicated upon the fact that under the terms of the syndicate agreement the managers were to do all the acts necessary to attain its purpose and to control the property, as if they had been the absolute owners thereof. The subscribers were merely to have a *pro rata* division of the cash or securities from time to time when divided, in the discretion of the managers. The leading Massachusetts case (*Williams* v. *Milton, supra*) has been cited with approval in *Crehan* v. *Megargel* (234 N. Y. 67, 79).

Applying the principles of the cases cited and the reasoning of the Court of Appeals in *Jones* v. *Gould* (*supra*), we conclude that under the syndicate agreement here the managers occupied a position similar to that of trustees, and the subscribers that of beneficiaries. Under the agreement full power and control was given to the syndicate managers, even with respect to a change in

personnel. The subscribers practically received nothing but the right to a *pro rata* share of whatever profits might be realized. The syndicate managers, therefore, were liable on contracts in general, and in particular upon the agreement here sued upon. They themselves seem to have realized their true relation, for, in the tripartite agreement, whereby the syndicate took over Mackie's rights from the Chemical Corporation, it was distinctly provided that the managers were not in any way to be personally liable by reason of such agreement. If they had been acting merely as agents for the subscribers, there would have been no need of thus personally exculpating themselves.

The result reached herein is not inequitable. Plaintiff's assignor from his own testimony never relied upon the subscribers. He looked only to Mackie and the managers. There is nothing in the record that would cause the court to seek other than a strict application of the rule here enunciated. Plaintiff's right of recovery, if any, was and is against the syndicate managers.

It follows, therefore, that the judgment appealed from should be reversed, with costs, and the complaint dismissed as to the appellants, with costs.

DOWLING, P. J., FINCH and McAVOY, JJ., concur; MARTIN, J., dissents.

Judgment reversed, with costs, and complaint dismissed as to defendants, appellants, with costs.